**Adam R.F. Gustafson**
Principal Deputy Assistant Attorney General

**Bradley Craigmyle**
Deputy Assistant Attorney General

**Stephen Bartell**
Assistant Section Chief

**Mark Widerschein** (OH #100162)
**Michelle Nkeng** (DC #1617481)
**Katharine Laubach** (CO #42693)
Trial Attorneys
Natural Resources Section
Energy & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Mark.Widerschein@usdoj.gov
Michelle.Nkeng@usdoj.gov
Katharine.Laubach@usdoj.gov
202-532-5803 (Widerschein)
202-598-6660 (Nkeng)
202-353-5765 (Laubach)
*Counsel for the United States*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| United States of America, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>State of Idaho, *et al.*<br><br>Defendants. | **Case No. 1:26-cv-592**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs the United States of America, *et al.*, allege as follows:

1. Established in 1949 as the National Reactor Testing Station, the Idaho National Laboratory ("INL") is a premier 890-square-mile Department of Energy ("DOE") reservation

located in southeastern Idaho. For over 70 years, INL has served as the backbone of nuclear innovation for the United States. It is home to the historic Experimental Breeder Reactor-I—which produced the world's first usable nuclear-generated electricity in 1951—and has played a foundational role in prototyping and testing nuclear reactors for the U.S. Department of the Navy ("Navy"). The world's first submarine nuclear reactor prototype achieved criticality at the INL in 1953, and the first surface-ship nuclear reactor prototypes achieved criticality at the INL in 1958 and 1959.

2. Today, INL is designated as the nation's lead laboratory for nuclear energy research, development, and demonstration. The execution of these programs relies entirely on several highly specialized facilities at INL that are unavailable anywhere else in the world. For this reason, INL hosts the Naval Nuclear Propulsion Program's ("NNPP") Naval Reactors Facility ("NRF"), as part of the joint DOE–Navy NNPP.

3. In addition to these established facilities, INL is currently leading a historic nuclear energy renaissance. In May 2025, Executive Order 14301 ("Reforming Nuclear Reactor Testing at the Department of Energy") established the Reactor Pilot Program. Executive Order No. 14301 ("E.O. 14301"), 90 Fed. Reg. 22591 (May 23, 2025). This program overhauled federal procedures and set an ambitious goal to construct, authorize, and achieve zero-power criticality (a self-sustaining nuclear reaction) on at least three advanced reactors by July 4, 2026. *Id.* at 22592. E.O. 14301 specifically named INL as having principal responsibility for facilitating the construction and testing of new reactor designs, and INL delivered on its mandate with four reactors reaching criticality over the last year. INL's operations are critical to supporting national security, including Navy operations, and energy security in the form of a robust civil nuclear energy program.

4. In support of this energy dominance and national security mission, DOE holds a water right reserved under federal law in the amount of 35,000 acre-feet-annually, decreed in the Snake River Basin Adjudication ("SRBA"), after the United States entered a Water Rights Agreement with the State of Idaho ("State"). *See* Ex. 1 at 7.

5. On May 14, 2026, the Director of the Idaho Department of Water Resources ("IDWR") entered a Final Order Curtailing Ground Water Rights Junior to October 11, 1900 ("Order"). *See* Ex. 2. DOE's water right is included in the Order, along with those of other federal agencies. *Id.*, Attach. A at 20. The Order required use of water to be cut to zero.

6. The Order, and Idaho's statutory scheme which authorized it, unconstitutionally and unlawfully seeks to require the United States' participation in a state administrative proceeding for which the United States has not waived its sovereign immunity, and to directly regulate federal agencies contrary to the Supremacy and Property Clauses of the United States Constitution and the principle of federal sovereign immunity.

7. Curtailment of INL's water right would disrupt this national nuclear energy momentum. The Advanced Test Reactor and other reactor facilities rely on a steady supply of processed groundwater for reactor cooling and emergency safety operations. Forcing these facilities to curtail operations poses nuclear safety risks and would halt research support for the Navy's nuclear-powered warships and commercial advanced reactor licensing. Curtailment would force a suspension of the development of new reactor technologies and fuel fabrication projects at INL at a critical juncture in the nation's nuclear energy renaissance.

8. The United States brings this action to secure a ruling and judgment against the Defendants declaring the Order invalid as applied to the United States, that IDWR lacks the authority to administer federal water rights, and permanently enjoining the Order's enforcement

against the United States and the Director's exercise of authorities purportedly granted by state-law to do so against the United States in the future.

**Jurisdiction & Venue**

9. This is a civil action brought by the United States in part under the United States Constitution and in part under other laws. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1331 (federal question), 1345 (United States as plaintiff), 1367 (supplemental jurisdiction), and 2201(a) and 2202 (Declaratory Judgment Act).

10. Venue is proper in this District pursuant to 28 U.S.C § 1391(b) because: (1) all Defendants reside here; and (2) a substantial part of the events giving rise to this Complaint occurred here.

**Parties**

11. Plaintiff is the United States of America, suing on its own behalf and on behalf of its executive departments and their subdivisions, including but not limited to those listed in paragraphs 12-14 below.

12. DOE is a federal agency of the United States charged by Congress with, *inter alia,* management of the National Laboratories. Pursuant to E.O. 14301, INL has principal responsibility for constructing and testing new nuclear reactor designs. *See* E.O. 14301. The National Nuclear Security Agency ("NNSA") is a federal agency within DOE. NNSA is charged by Congress with, *inter alia*, "provid[ing] the United States Navy with safe, militarily effective nuclear propulsion plants and to ensure the safe and reliable operation of those plants." 50 U.S.C. § 2401(b)(3).

13. The U.S. Department of Defense is an executive department of the United States charged with coordinating and supervising the United States Armed Forces. The Navy is a

military department within the Department of Defense.

14. DOE and the Navy are jointly responsible for the NNPP. The NNPP organic statute, at 10 U.S.C. § 6102 and 50 U.S.C. § 2406, codifying Executive Order 12344, 47 Fed. Reg. 4979 (Feb. 1, 1982), sets forth the total responsibility of the NNPP for all aspects of the Navy's nuclear propulsion, including research, design, construction, testing, operation, maintenance, and ultimate disposition of naval nuclear propulsion plants.[1]

15. Defendant State of Idaho is a state of the United States.

16. Defendant IDWR is an agency of the State of Idaho and is responsible under state law for concurrent administration of groundwater with surface water.

17. Defendant Matthew Weaver is Director of IDWR and, in his official capacity, signed the Order and has responsibility under state law for administering water rights.[2]

**General Allegations**

**Legal Background**

18. The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . , shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.

19. Intergovernmental immunity arose from the Supreme Court's decision in *McCulloch v. Maryland*, 17 U.S. 316 (1819), "which established that 'the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government.'" *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010)

---

[1] Hereinafter referred to collectively as the "United States."

[2] Hereinafter referred to collectively as "Defendants."

(quoting *McCulloch*, 17 U.S. at 436).

20. "It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides clear and unambiguous authorization for such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) (citation modified); *see also Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996) ("[S]tates may not directly regulate the federal government's operations or property.").

21. "The doctrine of intergovernmental immunity stems from the Supremacy Clause of the United States Constitution, which guarantees, in part, that 'the Laws of the United States . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *United States v. Idaho*, 746 F. Supp. 3d 881, 902 (D. Idaho 2024) (quoting U.S. Const. art. VI, cl. 2.). Intergovernmental immunity "prohibits state laws that either regulate the United States directly or discriminate against the Federal Government or those with whom it deals." *Id.* (quoting *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 758 (9th Cir. 2022)) (citation modified).

22. Pursuant to the Supremacy Clause, federal law can preempt and displace state law. A court may "infer preemption if there is an actual conflict between federal and state law. Conflict preemption is found where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]" *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003) (citation modified).

23. Under the doctrine of sovereign immunity, the United States is immune from suit, including by states, absent an express waiver by Congress. *Block v. North Dakota*, 461 U.S. 273, 280 (1983).

24. The Property Clause of the United States Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]" U.S. Const. art. IV, § 3, cl. 2.

25. "Under this clause, '[t]he power over the public land thus entrusted to Congress is without limitations.'" *State of Nev. v. Watkins*, 914 F.2d 1545, 1552 (9th Cir. 1990) (quoting *California Coastal Comm'n v. Granite Rock Co*., 480 U.S. 572, 580 (1987)). This includes the power to "control the occupancy and use of the public lands" and "protect the public from hazardous conditions on those lands." *Id.*

26. The McCarran Amendment is a limited waiver of the United States' sovereign immunity. It provides consent only "to join the United States as a defendant in" a "suit" for "the adjudication of rights to the use of water of a river system or other source," or "the administration of such [decreed] rights." 43 U.S.C. § 666(a). As a waiver of sovereign immunity, the Amendment "must be strictly construed in favor of the United States," *United States v. Idaho ex. rel. Dir., Idaho Dep't of Water Res*., 508 U.S. 1, 7 (1993) (citation omitted), and does not constitute a general waiver of federal sovereign immunity for every kind of state action related to the use or allocation of water, *Miller v. Jennings*, 243 F.2d 157, 159 (5th Cir. 1957).

27. Idaho Code § 42-237a(g) empowers the Director of IDWR "[t]o supervise and control the exercise and administration of all rights to the use of ground waters and in the exercise of this discretionary power he may initiate administrative proceedings to prohibit or limit the withdrawal of water from any well during any period that he determines that water to fill any water right in said well is not there available." Idaho Code § 42-237a(g). The power is exercised only by the Director, and "in his sole discretion." Idaho Code § 42-237a.

28. Idaho Code § 42-602 gives the Director of IDWR "direction and control of the

distribution of water from all natural water sources within a water district to the canals, ditches, pumps and other facilities diverting therefrom." Idaho Code § 42-602.

**Factual Background**

29. The United States and the State entered a Water Rights Agreement in 1990 which recognized a water right for DOE in the amount of 35,000 acre-feet-annually, with a priority date of April 7, 1950. *See* Ex. 1 at 7. Diversion is authorized from any point within the boundaries of INL. *Id.*

30. The United States and the State agreed that the right "is a Federal Reserved Water Right with all the characteristics appertaining thereto" and "[n]on-use of all or any part of the Federal Reserved Water Right shall not constitute a relinquishment, forfeiture, or abandonment of the right." *Id.* at 8.

31. The United States and the State were "unable to agree upon . . . . whether and to what extent the Director has authority to administer federal water rights" and, accordingly, "each party reserve[d] the right to litigate the issue of administration, if and when the need arises." *Id.* The need has arisen.

32. DOE's water right was decreed in the SRBA on June 20, 2003, *nunc pro tunc* to January 15, 1998. *See* Ex. 3 (Order of Partial Decree 34-10901). The partial decree was then incorporated into the SRBA's Final Unified Decree. *See* Ex. 4 (*In Re: SRBA*, Case No. 39576, Final Unified Decree (Aug. 25, 2014)) ("Final Unified Decree").

33. However, the underlying settlement controls. The Final Unified Decree states that "[i]n the case of any conflict between this Final Unified Decree and the partial consent decrees approving reserved water right settlements, the partial consent decrees approving the reserved water right settlements . . . shall control." Final Unified Decree at 10–11.

34. The only provision for administration in the Final Unified Decree states that "[t]he decreed water right shall be administered in the Snake River Basin water system in accordance with this Final Unified Decree and applicable federal, state and tribal law, **including the administrative provisions set forth in the federal reserved water right settlement agreements**" which were incorporated into the Final Unified Decree. *Id.* at 13 (emphasis added).

35. On July 25, 2025, the Director entered a Final Order Curtailing Ground Water Rights Junior to October 11, 1900. Although DOE's water right is junior to October 11, 1900, IDWR properly excluded it from the list of water rights to be curtailed.

36. However, on May 14, 2026, the Director entered another Order Curtailing Groundwater Rights Junior to October 11, 1900 ("Order"). *See* Ex. 2. Contrary to past practice, the 2026 Order included DOE's water right on the curtailment list. *See id.*, Attachment A, at 20. No explanation was provided for the discrepancy. *See generally id.*

37. The Order provides that curtailment can be avoided only if a party with a curtailed water right joins the mitigation plan of the groundwater district closest to them. *Id.* at 3; *see also* Idaho Code § 42-5259.

38. However, the mitigation statutes have been written to exclude the United States from lawful participation.

39. Idaho Code § 42-5259 allows for participation by non-members in groundwater districts solely for mitigation purposes. However, the statute allows participation only "[u]pon written request from any **ground water user** who is not a member of a district." *Id.* (emphasis added). Ground water user is a defined term in chapter 52. Idaho Code § 42-5201(8). Ground water user is defined to exclude the United States: "for purposes of this chapter, the term ground water user shall not include any ground water right held by or on behalf of an Indian tribe or by

tribal members for diversion and use within an Indian reservation, **ground water rights held by the United States** or ground water rights held by the state of Idaho." *Id.* (emphasis added).

40. Further, even if the United States could lawfully join a mitigation district, the State lacks legal authority to require a federal agency to pay to join a mitigation district for the sole purpose of avoiding an unlawful exercise of state authority.

41. On July 24, 2026, the Director entered an Order Rescinding 2026 Curtailment of DOE Water Right No. 34-10901; Order Denying Request for Hearing regarding the DOE water right. However, other federal water rights are included within the Order, and on information and belief, IDWR intends to curtail the DOE water right in future water years.

**Declaratory Relief Allegations**

42. There is an actual controversy between the United States and the Defendants with respect to the validity of the Order, the applicability of Idaho Code § 42-237a(g) to groundwater rights held by the United States, and the Director's authority to administer federal water rights outside the confines of the State's general stream adjudications.

43. The United States asserts that the Order unlawfully directly regulates an agency of the United States contrary to the United States Constitution, principles of federal sovereign immunity, and the McCarran Amendment. The Order is therefore invalid and unlawful to the extent it applies to the United States and may not be lawfully applied or enforced against the United States or its agencies.

44. The United States asserts that Idaho Code § 42-237a(g) purportedly authorizes the Director to exercise authority against the United States unlawfully and in derogation of Congress's limited waiver of sovereign immunity to facilitate participation in general stream adjudications. It is therefore invalid to the extent it applies to the United States and may not be

lawfully applied or enforced against the United States or its agencies.

45. The United States asserts that, pursuant to the McCarran Amendment's limited waiver of sovereign immunity which is constrained to "suits," 43 U.S.C. § 666, the Director lacks the authority to administer federal water rights through administrative proceedings.

46. Upon information and belief, Defendants assert that the Order is a valid exercise of the authority granted by Idaho Code § 42-237a(g). The Order is self-effectuating and thus requires no action by Defendants to further implement.

47. Upon information and belief, Defendants assert that Idaho Code § 42-237a(g) lawfully grants the Director authority to administer the United States' water rights.

48. Upon information and belief, Defendants assert that the Director may administer the United States' water rights pursuant to the McCarran Amendment.

49. Pursuant to 28 U.S.C. § 2201(a), this Court has, and should exercise, the authority to declare the legal rights and obligations of the parties with respect to the Order and provisions of the Idaho Code and their application or enforcement. *See* 28 U.S.C. § 2201(a) ("[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."). Federal Rule of Civil Procedure 57 further states that a "court may order a speedy hearing of a declaratory-judgment action." Fed. R. Civ. P. 57.

## Claims

### FIRST CLAIM FOR RELIEF

### (Supremacy Clause – Direct Regulation)

50. The United States incorporates by reference its previous allegations as though fully set forth herein.

51. Through the Order, and IDWR's program of administering water rights, Defendants are attempting to directly regulate federal agencies. However, federal installations are shielded by the Supremacy Clause from direct state regulation, unless Congress has provided clear and unambiguous authorization for such regulation. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988). The State cannot "directly regulate the Federal Government's operations or property." *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996).

52. Application of the Order constitutes "a direct and intrusive regulation by the State of the Federal Government's operation of its property at" the INL and other federal reservations. *Id.*

53. Congress has not provided clear and unambiguous authorization for the Order. Instead, Congress has approved a narrow scheme limited to "suits" for administration of water rights. *See* 43 U.S.C. § 666.

54. An "administrative proceeding[,]" Idaho Code 42-237a(g), purely before a state agency is not a suit as contemplated in the McCarran Amendment. While the Ninth Circuit has held that an administrative proceeding can constitute a suit, it was cabined to two specific scenarios: "the case is initiated in court and then referred to an agency for administrative proceedings or is initiated through an administrative procedure before being reviewed by a court." *United States v. State of Oregon*, 44 F.3d 758, 767 (9th Cir. 1994). Neither applies here: the proceeding was not referred to IDWR by the SRBA court, nor does it flow to the SRBA court for final resolution.

55. Instead, the State's delivery call structure is a purely administrative proceeding which unlawfully seeks to regulate the United States' water use at INL.

**SECOND CLAIM FOR RELIEF**

**(Supremacy Clause – Discrimination)**

56. The United States incorporates by reference its previous allegations as though fully set forth herein.

57. The State's mitigation statutes discriminate against the United States by defining terms so as to exclude the United States from lawful participation.

58. "Put simply, a state law discriminates against the federal government when 'it treats someone else better than it treats them'; or, conversely, when it treats the federal government worse than it treats everyone else." *United States v. Idaho*, 746 F. Supp. 3d 881, 903 (D. Idaho 2024) (quoting *Washington v. United States*, 460 U.S. 536, 545 (1983)).

59. Idaho Code § 42-5201 defines "ground water user" to exclude the United States. Indeed, it specifically "shall not include . . . ground water rights held by the United States." Idaho Code § 42-5201(8). Yet only a ground water user may lawfully participate in a mitigation plan pursuant to Idaho Code 42-5259. Accordingly, Idaho Code § 42-5201 treats others better than it treats the United States.

60. While the Director may not compel the United States to curtail its water use as currently structured, the remedy presented by the State itself unconstitutionally discriminates against the United States by treating all classes of groundwater users (other than the State itself and tribes) better.

61. The State's mitigation scheme unconstitutionally discriminates against the United States and cannot lawfully mitigate the Order.

**THIRD CLAIM FOR RELIEF**

**(Supremacy Clause - Preemption)**

62. The Atomic Energy Act establishes a national policy that "the development, use, and control of atomic energy shall be directed so as to make the maximum contribution to the general welfare, subject at all times to the paramount objective of making the maximum contribution to the common defense and security[.]" 42 U.S.C. § 2011(a).

63. Congress has made the NNPP responsible for the Navy's nuclear propulsion work. *See* 10 U.S.C. § 6102, 50 U.S.C. § 2406 (codifying E.O. 12344) (Feb. 1, 1982). This encompasses the "research, development, design, procurement, specification, construction, inspection, installation, certification, testing, overhaul, refueling, operating practices and procedures, maintenance, supply support, and ultimate disposition, of naval nuclear propulsion plants, including components thereof, and any special maintenance and service facilities related thereto," and the "safety of reactors and associated naval nuclear propulsion plants, and control of radiation and radioactivity associated with naval nuclear propulsion activities, including prescribing and enforcing standards and regulations for these areas as they affect the environment and the safety and health of workers, operators, and the general public." E.O. 12344, Sec. 5(c); Sec. 7(a); Sec. 8(a).

64. Curtailment of water use to zero at the INL would directly conflict with the NNPP's ability to fulfil those responsibilities, including research and development, refueling (as there is no alternative infrastructure to receive naval spent fuel), inspection and ultimate disposition of naval spent fuel (the critical component of the naval nuclear propulsion plant), and the construction of associated service facilities (*e.g.*, the Spent Fuel Handling Project).

65. The nuclear and radioactive materials at NRF represent the largest consolidated

source of radiation and radioactivity associated with the naval nuclear propulsion activities. Curtailment of water use to zero would curtail all work at NRF and prevent the NNPP from fulfilling its responsibility to control nuclear materials safely.

66. The NNPP is a major user of the INL's Advanced Test Reactor. A shut down of the Advanced Test Reactor would prevent the NNPP from receiving irradiation testing data and therefore would impact operational capabilities in the active fleet and delay deployment of new technologies that are critical to maintaining the Navy's warfighting advantage.

67. Among other recapitalization projects underway at NRF, a new Spent Fuel Handling Facility is being constructed with concrete as a major building material, which requires water to produce. If NRF's water usage is curtailed, construction delays are likely. Delaying construction would delay the operational capability of this facility, which is needed to support U.S. Navy aircraft carrier refueling in the 2030s. It also will delay decommissioning of the current facility which became operational in 1957, prolonging the amount of time the NNPP continues to conduct operations in a spent fuel water pool that does not meet modern design standards.

68. Personnel, with daily domestic water needs, are required on site at the INL and NRF to perform labor for spent nuclear fuel management, examination duties, and emergency response, and other research operations. Any disruption to the availability of potable water could delay execution of work that directly supports the naval nuclear fleet and shipyards. Extended loss of potable water for domestic uses for the 1500 people on site could create personnel safety risks.

69. Curtailment of water use would prevent expansion of operations at the INL.

70. DOE asserts that it cannot comply with its obligations to safely operate nuclear

reactors and manage spent fuel at the INL without using water. The Navy asserts that it cannot comply with its obligations to support the nuclear fleet and manage spent fuel at the INL without using water. Yet, DOE and the Navy cannot comply with the State's Order without cutting the use of water at INL to zero. The Order thus threatens national security and nuclear safety, and interferes with the operation of Congressionally mandated programs.

71. Accordingly, federal law impliedly preempts the Order, as it conflicts with DOE and the Navy's ability to comply with federal law mandates. While the Order has been rescinded as to DOE in 2026, the State is actively seeking a declaration that it has the authority to curtail water use at INL in future years. It is accordingly likely that the State intends for curtailment to recur.

**FOURTH CLAIM FOR RELIEF**

**(Property Clause)**

72. The United States incorporates by reference its previous allegations as though fully set forth herein.

73. The Order purports to divest the United States and its agencies of vested property rights owned by the United States. The Property Clause of the United States Constitution, however, provides that the "[p]ower to release or otherwise dispose of the rights and property of the United States is lodged in the Congress." *Royal Indemnity Co. v. United States*, 313 U.S. 289, 294 (1941).

74. Congress has exercised that power through the McCarran Amendment. By purporting to divest the United States and its agencies of property without compliance with congressional authorization, the Order violates the Property Clause of the United States Constitution.

## PRAYER FOR RELIEF

75. Wherefore, the United States prays that the Court enter judgment in its favor and against the Defendants and award the following relief:

a. a declaration that the Order is invalid as applied to the United States and its agencies;

b. a declaration that IDWR lacks the authority to administer federal water rights;

c. an order permanently enjoining the Director of IDWR from exercising his authority under Idaho Code 42-237a(g), or any other state-law statutory authority, as to the United States or its agencies;

d. the United States' costs; and

e. such other and further relief as the Court deems just and proper.

Respectfully submitted this 11th day of September, 2026,

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General

Bradley Craigmyle
Deputy Assistant Attorney General

Stephen Bartell
Assistant Section Chief

***/s/ Mark J. Widerschein***
Mark Widerschein
Michelle Nkeng
Katharine Laubach
Trial Attorneys
Natural Resources Section
Energy & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
*Counsel for the United States*